[Cite as *State v. Jenkins*, 2018-Ohio-2397.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 105881

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**TREVONTE JENKINS**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-610627-A

**BEFORE:** Boyle, J., McCormack, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** June 21, 2018

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, Ohio   44116


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:   Khalilah A. Lawson
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

{¶1}    Defendant-appellant, Trevonte Jenkins, appeals his convictions and sentence. He raises the following assignments of error for our review:

1. Appellant was denied a fair trial where an in-court identification was impermissibly suggestive.

2. The trial court abused its discretion by denying Appellant's request for a *Telfaire* instruction where it was warranted by the evidence.

3. Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motion for acquittal.

4. The convictions were against the manifest weight of the evidence.

5. Appellant's sentence was contrary to law where it was clearly and convincingly not supported by the record.

6. The trial court erred by failing to merge all allied offenses of similar import and by imposing separate sentences for allied offenses which violated Appellant's state and federal rights to due process and protections against double jeopardy.

7. Defendant's constitutional rights were violated when Det. Miller improperly commented on his decision to remain silent.

{¶2}    Finding no merit to Jenkins's assignments of error, we affirm.

**Procedural History and Factual Background**

{¶3}    A Cuyahoga County Grand Jury indicted Jenkins for two counts of attempted murder in violation of R.C. 2903.02 and 2923.02, two counts of felonious assault in violation R.C. 2903.11(A)(2), two counts of discharging a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), two counts of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(A) and (B), one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), one count of criminal damaging or endangering in violation of R.C. 2909.06(A)(1), and one count of domestic violence in violation of R.C. 2919.25(A).

Except for the counts for criminal damaging or endangering and domestic violence, all of the counts carried one-, three-, and five-year firearm specifications. Additionally, the counts for attempted murder and felonious assault carried a notice of prior conviction and a repeat violent offender specification.

{¶4} Jenkins waived his right to a jury trial as to the counts for having weapons while under disability, the notices of prior conviction, and repeat violent offender specifications. Prior to trial, Jenkins filed a motion in limine, requesting the court to prohibit the state's witness, John Eanes, from identifying Jenkins during trial, arguing that the identification would be unreliable and unduly suggestive. After a hearing, the court denied Jenkins's motion. Before Eanes testified at trial, Jenkins renewed his objection on the same grounds, which the court denied.

{¶5} The following evidence was presented at trial.

{¶6} On October 7, 2016, the Beautiful Soulz festival, featuring local hip-hop artists, took place at the Phantasy club on Detroit Avenue in Lakewood, Ohio. Phantasy is part of a larger complex containing three separate bars and venues, including the Phantasy, the Symposium, and the Chamber.

{¶7} Jonathan Bobak went to Phantasy that night after one of the performing artist's promoters hired him to take photographs of the event. Bobak testified that he went outside the complex to smoke a cigarette around 10:00 p.m. that evening. He stated that while outside, he saw Jenkins hit "a Caucasian female," who he believed to be Jenkins's girlfriend, multiple times on the sidewalk outside of the complex. Bobak testified that a number of men approached and beat up Jenkins for hitting his girlfriend and that he eventually intervened because the men were "really kind of roughing [Jenkins] up a bit" and figured that Jenkins had "learned his lesson."

Bobak told Jenkins to go home and saw him walk toward Value World, which was a few hundred feet away from the complex. He testified that people visiting the complex typically park in the Value World parking lot for events.

{¶8} According to Bobak, after Jenkins left, the woman who Jenkins had hit was a "mess," crying and slurring her words. He stated that the woman kept saying that she "needed to call [her] dude" and that she appeared to be under the influence "of something." Bobak eventually left to go back inside to the festival, and after working for another hour and a half, decided to leave and walked outside around 12:00 a.m. He testified that as he waited for his ride, he saw the same woman from earlier walking toward Value World and then get into the passenger side of a white vehicle parked in the businesses' parking lot. Bobak could not see who was driving the white vehicle. He stated that the vehicle exited the Value World parking lot, turned left on Detroit, and drove by the complex. He testified that he saw the vehicle's driver's-side window roll down right before gunshots were fired toward the complex and that upon realizing that it was gunfire, people began running into the complex. Bobak suffered a gunshot wound to his right leg during the incident, and he testified that he received treatment for the wound a few hours later.

{¶9} Bobak also testified that law enforcement visited him later that day to look at a photo array. Bobak identified Jenkins in the photo array as the man involved in the fight with the woman that occurred earlier on the night of October 7 outside of Phantasy. At trial, Bobak stated that although he did not see the shooter, he assumed that Jenkins was the shooter after witnessing the woman get into the vehicle later after saying she needed to contact "her dude."

{¶10} George Trouche testified that he visited Phantasy on October 7, 2016, to perform at the music festival. He stated that toward the end of the night he was waiting outside for a ride

when someone started shooting. He testified that he was standing outside in front of the complex when he heard the gunshots. He ran inside and later realized that he had been shot in the leg. At trial, Trouche admitted that he did not see where the shots were coming from or who the shooter was.

{¶11} Gregory Cunningham testified that he is the owner of G-Enforcement, a personal security company that staffs security guards for venues and celebrities. He stated that he, along with several of his employees, were at the complex that night, working the venues and the entrances. According to Cunningham, at one point during the evening, he was outside the complex and witnessed a "young man fighting a * * * white young lady." He testified that he saw the man punch the woman "at least" five times before he intervened and that some other men approached the young man and started fighting with him. Cunningham eventually intervened in the fight between the man and the other men, and after he broke up that fight, the man walked toward the Value World parking lot and got into a white four-door vehicle. He stated that after breaking up the fight, the woman, who seemed intoxicated, said that the man was her boyfriend.

{¶12} Cunningham testified that the woman asked him if she could use his cell phone to call her boyfriend so that he could come back and get her. Cunningham gave her his phone, retrieved it a few minutes later, and then went back inside Phantasy. A few minutes later, a number of people ran inside the complex shouting, "[H]e's out there shooting, the young man that drove away in the white car."

{¶13} While he was not outside when the shots were fired, Cunningham testified that he spoke to law enforcement when they arrived and viewed a photo lineup later that day. The lineup administration form was presented at trial and shows that one of the six pictures is circled; the one that is circled is not Jenkins. When presented with the form at trial, Cunningham

testified that he did not personally circle or initial the page with the pictures of the suspects. He testified that he told the officer that he recognized two men in the lineup, one of whom was Jenkins. He also told the officer that the men he identified were at Phantasy and that Jenkins was the man involved in the fight with the woman.

{¶14} John Eanes, Jr. testified that he worked as a security guard for G Enforcement, and that he was working Phantasy's front door all night. He testified that during the night, he witnessed a man and woman arguing and fighting a few feet away from Phantasy's entrance. He stated that they were screaming at each other for a few minutes when the man began hitting the woman. Eanes said that a group of men then approached the man and began fighting him and that eventually he and Cunningham intervened. He stated that after the fight was broken up, Jenkins walked toward the Value World parking lot and, a few minutes later, pulled out of the parking lot in a "white Ford Fusion."

{¶15} Eanes testified that the woman with whom Jenkins was fighting remained outside of Phantasy and seemed to be "high or something." He stated that the woman indicated that she needed a ride to Lorain County and that he radioed Cunningham to assist her. About two hours later, Eanes saw the white vehicle return and pull into the Value World parking lot. He also saw the woman walk toward Value World and testified that a short time later, the white vehicle pulled out and drove toward Phantasy. Eanes stated that as the vehicle approached Phantasy, he saw the vehicle's driver's-side window roll down, saw Jenkins's face, saw the woman in the passenger seat, and saw Jenkins point a gun out of the driver's-side window toward the group of people in front of Phantasy. He stated that there were about 20 people outside of Phantasy at that time and that he told everyone to get inside when the gunfire started.

{¶16} According to Eanes, he did not speak to the police because he told Cunningham

what he witnessed and that Cunningham took the lead and said he would contact Eanes if he needed anything. Eanes testified that he did not speak to police until a few weeks before trial, months after the shooting. When asked why he did not give a statement to the police earlier, Eanes stated that he was not aware that the police had identified and caught the shooter.

{¶17} At trial, Eanes stated that he got a good look at both the man and the woman and that the lighting in the area outside of Phantasy was good. He testified that he remembered the man who was fighting the woman and identified Jenkins as that man in court.

{¶18} Sadie Jones testified that she worked as a bartender at Phantasy that night and arrived around 7:00 p.m., parking her 2006 Ford Freestyle right in front of the entrance to the venue. During the shooting, Jones's vehicle was hit multiple times. Jones stated that her vehicle's rear tire was flat as the result of a gunshot, the driver's-side window was "shot out," her driver's-side door had a bullet hole, and her driver's-side headrest had a bullet hole.

{¶19} Sarah Super testified that she went to Phantasy on the night of October 7 with Jenkins, who was her boyfriend at the time, but as of the date of trial was her fiancé. She stated that they went to the club around 9:30 p.m. and that Jenkins drove them in a white four-door rental car and that they parked "around the corner from the club[.]" Super stated that she did not know the make or model of the vehicle.

{¶20} According to Super, she drank a Four Loko on the way to Phantasy and continued drinking at Phantasy and was heavily intoxicated. Because of this, Super explained that she did not recall getting into a verbal or physical altercation with Jenkins that night. When asked about the bruises that officers observed the next day at Super's house, Super testified that it was "probably" from her "drunk stumbling" that night and that she "probably fell down [her] steps[.]" Exhibits submitted by the state during Super's testimony showed bruises and scratches on

Super's chin, neck, right eye, left cheek, lower back, arms, and elbow. Super stated that she did not have the bruises before going to Phantasy that night.

{¶21} Super testified that she did not remember leaving Phantasy and did not know how she got home that night. She blacked out and did not recall hearing any gunfire. Super stated that when she woke up the next morning, Jenkins was with her, and the white rental car they drove to Phantasy the night before was parked outside of her home. When shown a photograph of the rental vehicle, she confirmed that the vehicle's license plate was from Wisconsin and read 876XPZ. When shown another photograph of items found in the vehicle, Super identified one of the items as her wallet, but stated that she could not remember if she had her wallet on her person when she went to Phantasy on October 7.

{¶22} Officer Daniel Hilfiker testified that he was the officer who administered the photo lineup with Cunningham. He testified that Cunningham wrote on the form and circled the picture. The officer was unclear as to what his instructions were. He stated that after reading Cunningham the instructions, he "showed him the pictures, and [] said if you see anybody you recognize, * * * just circle them, initial and date." Later, however, Officer Hilfiker agreed that the purpose of the photo lineup was to identify the shooter. He also testified that Cunningham only identified one individual, which was not Jenkins, and that he understood Cunningham's identification to be of the shooter.

{¶23} Officer Ariana Zuk of the Lakewood Police Department testified that she responded to a call of an incident at Phantasy on October 8 and, upon arriving, began identifying evidence at the scene. She testified that she discovered that the suspect shooter had been identified as a "[b]lack male who was with a white female[, who] * * * had left eastbound in a white four-door vehicle[.]" Officer Zuk stated that officers found a keychain with a tag at the

scene that "came off of the suspected shooter" and contained the make, model, and year of the vehicle ("2015 HYUN ACNT"), the license plate number ("876XPZ"), and the vehicle's color ("white"). The tag also stated, "Average Key Replacement Cost $225."

**{¶24}** Laura Stanton testified that she is a forensic DNA analyst with the Cuyahoga County Medical Examiner's Office. She explained that based on her test of item four, which was a blood swab from the driver's seat of the white rental vehicle (later identified as a Hyundai Accent), Jenkins was the source of the DNA to a reasonable degree of scientific certainty.

**{¶25}** Officer Jeffrey Robinson of the Lakewood Police Department testified that he responded to the scene and took photographs of the evidence and that based on the bullet holes in Jones's vehicle, the shots were "coming from a moving object[.]" He admitted on cross-examination, however, that his conclusion was a general assumption based on his observations and was not the result of in-depth calculations concerning the bullet holes' angles.

**{¶26}** Sergeant Duane Brown of the Lakewood Police Department testified that he was in the police station that night when he received a request to check the traffic cameras for information related to a drive-by shooting that occurred outside of Phantasy. He said that he received a phone call about shots being fired around 12:46 a.m. He reviewed the footage and witnessed a white four-door sedan driving northbound on West 117th Street toward Phantasy around 12:41 a.m. He stated that another camera captured the same car heading westbound on Detroit Avenue toward Phantasy a minute later. At trial, Sergeant Brown admitted that the cameras did not capture any part of the drive-by shooting.

**{¶27}** Detective Terry Miller of the Lakewood Police Department testified that he was assigned to investigate the shooting outside of Phantasy and reviewed the footage collected from the traffic cameras. He identified the suspect vehicle based on the keychain collected from the

scene and observed the vehicle on the footage entering the city around 12:41 a.m. When asked about some of the witnesses' statements that the suspect vehicle was a Ford Fusion or Taurus, Detective Miller stated that he did not "put a lot of credence into that" because "[g]enerally, sedans that are all generic looking, anybody in my opinion can be confused[.]" Detective Miller stated that he was able to identify the vehicle's license plate information from a still photograph of the camera footage "[a]fter kind of zooming in and out."[1] Detective Miller stated that he contacted Enterprise Rent-A-Car and learned that the vehicle was a 2015 Hyundai Accent that was rented to Jenkins from an Enterprise location in Elyria.

{¶28} Based on that information, Detective Miller explained that officers obtained an arrest warrant for Jenkins and a search warrant for the addresses where police believed Jenkins lived, one of which was Super's home in Elyria. According to Detective Miller, during the search of Super's home, as well as the search of the white rental vehicle parked outside of the home, officers located and photographed a ticket stub for the Beautiful Soulz festival on the weekend of October 7-8. Detective Miller stated that officers collected blood from the driver's seat vehicle of the car as well based on the fact that witnesses told officers that the shooter was in a fight earlier in the night and was "possibly bleeding." During the search, officers also collected some items of clothing, including a black T-shirt and a pair of blue jeans, which Super told officers that Jenkins wore to Phantasy on the night of the shooting. Further, when asked why officers did not contact Eanes right away, Detective Miller stated that officers "weren't aware that he existed as far as someone who had actually been a witness to the events."

{¶29} During trial, Jenkins requested that the court give the jury the instruction

---

[1] Despite Detective Miller's testimony, the state's exhibit containing the still photograph of the suspect vehicle from the traffic camera footage does not clearly show the vehicle's license plate information.

concerning eyewitness identification set forth in *United States v. Telfaire*, 469 F.2d 552 (D.C.Cir.1972), but the court denied his request.

{¶30} The jury found Jenkins guilty of all counts and the related firearm specifications. The bench found Jenkins guilty of having weapons while under disability and the notice of prior conviction and repeat violent offender specifications.

{¶31} At sentencing, the court found that the one- and three-year firearm specifications for the counts of attempted murder, discharge of firearm on or near prohibited premises, improperly handling firearms in a motor vehicle, and having weapons while under disability merged. The court merged the three-year firearm specifications for attempted murder and discharge of a firearm on or near prohibited premises and additionally merged all of the five-year firearm specifications.

{¶32} As to the counts themselves, the court merged Counts 1 (attempted murder), 3 (felonious assault), and 5 (discharge of firearm on or near prohibited premises) and merged Counts 2 (attempted murder), 4 (felonious assault), and 6 (discharge of firearm on or near prohibited premises). The state elected to proceed to sentencing on Counts 1 and 2.

**{¶33}** The court sentenced Jenkins to 4 years of prison for Count 1, which was to run consecutive to the 3- and 5-year firearm specifications tied to that count, for a total of 12 years of prison. The court then sentenced Jenkins to 4 years of prison for Count 2, which was to run consecutive to the attached 3-year firearm specification for that count, for a total of 7 years of prison. The court sentenced Jenkins to 12-month terms of prison for his convictions for improperly handling firearms in a motor vehicle, which the court found did not merge; a 12-month term of prison for his conviction for having weapons while under disability; and 180-day terms of jail for his convictions for criminal damaging and domestic violence. All of those terms were to run concurrent to Jenkins's 7-year sentence for Count 2. Finally, the court ordered that Jenkins's sentence for Count 2 (7 years) run consecutive to his sentence for Count 1 (12 years), giving Jenkins an aggregate prison sentence of 19 years.

**{¶34}** It is from this judgment and sentence that Jenkins now appeals.

**Law and Analysis**

**A. In-Court Identification**

**{¶35}** In his first assignment of error, Jenkins argues that the court erred when it denied his motion in limine, overruled his objection during trial, and allowed Eanes to identify Jenkins as the shooter during trial. Specifically, Jenkins argues that Eanes's in-court identification of him as the shooter was impermissibly suggestive and that Eanes's "limited ability to view the shooter," lack of attention, and description shows that his identification is unreliable.

**{¶36}** We review the trial court's ruling to admit Eanes's identification testimony for an abuse of discretion. *See State v. Walker*, 6th Dist. Lucas No. L-07-1156, 2008-Ohio-4614, ¶ 14, citing *State v. Graham*, 58 Ohio St.2d 350, 390 N.E.2d 805 (1979).

**{¶37}** While impermissibly suggestive pretrial identification procedures violate a

defendant's right to due process, "an in-court identification is permissible if the state establishes by clear and convincing evidence that the witness had a reliable, independent basis for the identification based on prior independent observations made at the scene of the crime." *State v. Fields*, 8th Dist. Cuyahoga No. 99750, 2014-Ohio-301, ¶ 10, citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Nelson,* 8th Dist. Cuyahoga No. 104336, 2017-Ohio-5568, ¶ 14. Here, it is undisputed that Eanes did not identify Jenkins as the shooter prior to trial. As a result, our analysis turns on whether Eanes's in-court identification was reliable.

**{¶38}** In *Nelson*, the appellant challenged a witness's in-court identification of him as the shooter. We found that the witness had a "sufficient opportunity to view the shooter" because he saw him on "three separate opportunities," was "three feet away from him when [the appellant] shot him[,]" and that his attention was on the shooter during the incident. *Id.* at ¶ 16-18. We recognized that the witness's in-court identification was "made under oath and subject to cross-examination[,]" during which the witness admitted to drinking, admitted that he told the emergency dispatcher that he did not see the shooter, and described the poor lighting at the scene of the crime. *Id.* at ¶ 20. We found that the witness had a "reliable independent basis for the identification based on his prior independent observations of the shooter at the scene of the crime." *Id.* at ¶ 23.

**{¶39}** Here, while Eanes did not identify Jenkins as the shooter before trial, the record reflects that his in-court identification was reliable. Like the witness in *Nelson*, Eanes testified that he was only a few feet away from the fight between Jenkins and Super. He testified that he got a good look at Jenkins on a number of different occasions that night: when Jenkins walked into Phantasy with Super; later, during the fight with Super; when Jenkins drove away after the

fight in a white vehicle; and finally, when Jenkins picked up Super and drove by Phantasy and fired a gun. While Jenkins argues that the time of day made Eanes's identification of him less reliable, Eanes also testified that the area outside of Phantasy is well lit and that he would "never forget" the shooter's face. Further, as to Jenkins's argument that Eanes had a limited ability to view the shooter because of Jones's SUV parked in front of Phantasy, Eanes testified that he walked back and forth while working security that night, and right before the shooting occurred, he was standing at the rear of the SUV. Eanes testified that, as a result, he was able to see the driver of the white vehicle as well as the gun that the driver was pointing out of his window toward Phantasy. Finally, like *Nelson*, Eanes's testimony was under oath and subject to cross-examination.

{¶40} Based on the foregoing analysis, we find that Eanes had a reliable and independent basis for identifying Jenkins as the shooter. We do not find that Eanes's in-court identification denied Jenkins his right to a fair trial or that the trial court abused its discretion in admitting that evidence. Accordingly, we overrule Jenkins's first assignment of error.

### B. *Telfaire* Instruction

{¶41} In his second assignment of error, Jenkins argues that the trial court abused its discretion when it denied his request for the eyewitness identification instruction set forth in *Telfaire*, 469 F.2d 552 (D.C.Cir.1972).

{¶42} We previously explained that the *Telfaire* instruction

> instructs the jury to consider, inter alia, "the capacity and opportunity of the witness to observe the defendant; the identification being or not being the product of the witness's own recollection, given the strength of the identification and the circumstances under which it was made; the inconsistent identifications that may have been made by the witness; and the general credibility of the witness."

*State v. Witherspoon*, 8th Dist. Cuyahoga No. 94475, 2011-Ohio-704, ¶ 23, quoting *State v.*

*Guster*, 66 Ohio St.2d 266, 268, 421 N.E.2d 157 (1981).

{¶43} While the Ohio Supreme Court approved the substance of the *Telfaire* instruction in *Guster*, it did not require the use of the instruction regarding eyewitness identification in every case, recognizing that the decision to give such an instruction was within the trial court's sound discretion. *Guster* at syllabus.

{¶44} In *Witherspoon*, we found that while the trial court did not give the *Telfaire* instruction, it instructed the jury to consider

> "the reasonableness of the testimony, the opportunity the person had to see, or hear or know the truth of the facts and circumstances * * *; and any other facts and circumstances surrounding the testimony, which, * * * would add or detract from the credibility and weight of the testimony."

*Id.* at ¶ 25. As a result, we concluded that the court's instruction "adequately informed the jury of its duty to carefully consider the credibility of and surrounding circumstances affecting the witness's identification." *Id.* at ¶ 26.

{¶45} Here, the trial court denied Jenkins's request for a *Telfaire* instruction. Like the trial court in *Witherspoon*, however, the trial court in this case gave a general instruction regarding eyewitness identification, stating:

> Concerning eyewitness testimony. Some things you may consider in weighing that testimony are: The capacity of the witness, that is, the age, intelligence, defective senses, if any, and the opportunity of the witness to observe; the witness'[s] degree of attention at the time he observed the offender; the accuracy of the witness'[s] prior description or identification, if any; whether the witness had occasion to observe the defendant in the past; the interval of time between the event and the identification, and all surrounding circumstances under which the witness had identified the defendant including deficiencies, if any, in lineup, photo display, or one on one.

Therefore, despite denying Jenkins's request for the *Telfaire* instruction, the court "adequately informed the jury of its duty to carefully consider opportunity of the witness to observe the defendant, the reasonableness of identification, and the credibility of the witness."

*Witherspoon*, 8th Dist. Cuyahoga No. 94475, 2011-Ohio-704, at ¶ 26. Accordingly, we find that the trial court did not abuse its discretion, and we overrule Jenkins's second assignment of error.

### C. Sufficiency of the Evidence

**{¶46}** In his third assignment of error, Jenkins argues that his convictions were not supported by sufficient evidence. He argues that the state did not introduce sufficient evidence (1) identifying him as the shooter, (2) establishing the necessary mens rea for his attempted murder and felonious assault convictions, and (3) satisfying the public-roadway element for his convictions for discharging a firearm at or near a prohibited premises.

**{¶47}** A sufficiency challenge essentially argues that the evidence presented was inadequate to support the jury verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis sic.)" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at 386, citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed. 652 (1982). When reviewing a sufficiency of the evidence claim, we review the evidence in a light most favorable to the prosecution. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996).

**{¶48}** Proof of guilt may be made by circumstantial evidence, which "requires the drawing of inferences that are reasonably permitted by the evidence[,]" but nevertheless "carries the same weight as direct evidence." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228,

2012-Ohio-4047, ¶ 13, citing *State v. Treesh*, 90 Ohio St.3d 460, 739 N.E.2d 749 (2001).

**{¶49}** Here, there was sufficient evidence from which the jury could find that Jenkins was the shooter. At trial, a number of officers testified that they located a keychain with information that matched Jenkins's rental vehicle and that they collected camera footage of a white four-door vehicle driving toward Phantasy five minutes before the shooting occurred. Detective Miller testified that he contacted the car rental agency, which informed him that the vehicle was rented to Jenkins. Additionally, a number of witnesses testified that Jenkins and Super fought outside of Phantasy, that Jenkins walked toward his vehicle in the Value World parking lot, that Super was telling people that she "needed to call her dude" after the fight and that the man was her boyfriend, that she eventually walked toward the same parking lot approximately two hours later when the same white vehicle returned, and that she got in the vehicle moments before it left the parking lot and drove toward Phantasy. Further, Eanes testified that he saw Jenkins driving the car and pointing a gun out of the driver's-side window right before the shooting occurred.

**{¶50}** While Jenkins points to evidence that the state did not find or produce — a positive gunshot residue test of Jenkins, the gun used, the red shirt that witnesses say Jenkins was wearing — the absence of that evidence does not render the state's evidence insufficient, especially when viewing the evidence in a light most favorable to the prosecution. Jenkins also points to witness statements identifying the car as something other than a Hyundai; however, the witnesses' misidentifications of the vehicle's make and model go to the weight of the evidence, not the sufficiency. *See State v. Strowder*, 8th Dist. Cuyahoga No. 105569, 2018-Ohio-1292, ¶ 34-36 (discussing the victim's prior misidentifications when addressing the appellant's manifest weight argument).

**{¶51}** Jenkins also argues that there was insufficient evidence to support the necessary

mens rea for attempted murder and felonious assault because there was no evidence that Jenkins targeted anyone. R.C. 2903.02 and 2923.02 (attempted murder) and R.C. 2903.11 (felonious assault) both require that an individual act knowingly. R.C. 2901.22(B) states that

> [a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

The state presented evidence that Jenkins pointed a gun out of a moving vehicle toward a crowd of 20 people and fired the gun multiple times. In fact, Eanes testified that he saw Jenkins aim the gun at the crowd and that the only reason he was not hit was because a parked vehicle blocked most of the bullets. That evidence is sufficient to show that Jenkins knew that his conduct would probably cause harm and possible death to one or more people in that crowd.

{¶52} Finally, Jenkins argues that the state did not present sufficient evidence to support his convictions for discharging a firearm because there was no evidence that he did so on a public roadway. R.C. 2923.162(A)(3) states, "No person shall * * * [d]ischarge a firearm upon or over a public road or highway." Contrary to Jenkins's argument, however, the following exchange took place during Bobak's testimony:

Q. * * * You're out on Detroit Avenue?

A. Detroit Avenue.

Q. That's a pretty busy thoroughfare you would agree?

A. Yes.

Q. You're right by 117th which is also a busy thoroughfare so are cars coming and going periodically?

A. Yeah.

Additionally, footage from Lakewood's traffic cameras shows that Detroit Avenue is a public

roadway. Jenkins offers no legal support for his argument that "the general testimony that W. 117th and Detroit are busy roads is insufficient to establish" the public-roadway element for his convictions. As a result, we find the testimony to be sufficient evidence, reject Jenkins's argument, and overrule his third assignment of error.

### D. Manifest Weight of the Evidence

{¶53} In his fourth assignment of error, Jenkins argues that his convictions were against the manifest weight of the evidence, specifically challenging the certainty and reliability of the identification evidence.

{¶54} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

{¶55} When reviewing a manifest weight challenge, an appellate court sits as the "thirteenth juror" and

> review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed[.]

*Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶56} Further, we must be mindful that questions of weight and credibility are primarily for the trier of fact to determine. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). This is because "'[t]he demeanor of witnesses, the manner of their responses, and many other factors observable by a jury * * * simply are not available to an appellate court on review.'"

*State v. Bailey*, 8th Dist. Cuyahoga No. 97754, 2012-Ohio-3955, ¶ 11, quoting *State v. Bierbaum,* 3d Dist. Seneca No. 13-88-18, 1990 Ohio App. LEXIS 1204 (Mar. 4, 1990). "[W]hen considering a manifest weight challenge, the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner, demeanor, gestures, and voice inflections, in determining whether the proffered testimony is credible." *State v. McNamara*, 8th Dist. Cuyahoga No. 104168, 2016-Ohio-8050, ¶ 36, citing *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999. "The jury may take note of any inconsistencies and resolve them accordingly, 'believing all, part, or none of a witness's testimony.'" *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 33, quoting *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958. "Therefore, we afford great deference to the factfinder's determination of witness credibility." *McNamara* at ¶ 36, citing *State v. Ball*, 8th Dist. Cuyahoga No. 99990, 2014-Ohio-1060. Accordingly, reversing a previous conviction and ordering a new trial under a manifest weight of the evidence claim should be saved for the "exceptional case in which the evidence weighs heavily against the conviction." *State v. Bridges*, 8th Dist. Cuyahoga No. 100805, 2014-Ohio-4570, ¶ 67, citing *Thompkins.*

{¶57} Here, the evidence identifying Jenkins as the shooter included Eanes's testimony that he observed Jenkins pointing a gun out of the driver's- side window of a white vehicle, witness testimony and camera footage showing Jenkins's rental vehicle driving toward Phantasy minutes before the shooting, witness testimony that the car was a white four-door sedan, and witness testimony identifying Jenkins as the man who assaulted Super and picked her up minutes before the shooting.

{¶58} While there were a number of inconsistencies and other factors affecting witness credibility — i.e., some of the witnesses testified that the white vehicle was a Ford Fusion or

Taurus while Jenkins's vehicle was a Hyundai; the inconsistencies between Cunningham's and Officer Hilfiker's testimony concerning whether Cunningham identified Jenkins in the photo lineup; and the fact that Eanes did not speak with police until a few weeks before trial and did not identify Jenkins as the shooter until trial — the jury heard those inconsistencies and factors and ultimately convicted Jenkins. After a review of the evidence, we find that this is not the "exceptional case in which the evidence weighs heavily against the conviction." *Bridges* at ¶ 67, citing *Thompkins*. Accordingly, we overrule Jenkins's fourth assignment of error.

### E. Allied Offenses

**{¶59}** In his fifth assignment of error, Jenkins argues that his conviction for Count 7 should have merged with his conviction for Count 8, both of which were for improperly handling firearms in a motor vehicle, but were under different subsections of R.C. 2923.16.[2]

**{¶60}** Pursuant to R.C. 2941.25(A), "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." However,

> [w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25(B).

**{¶61}** Two or more offenses are of dissimilar import within the meaning of R.C.

---

[2] In Jenkins's table of contents, he lists his assignment of error concerning his sentences as "Assignment of Error V," but identifies it as "Assignment of Error VI" in his legal argument. He identifies his assignment of error concerning the failure to merge allied offenses as "Assignment of Error VI" in his table of contents, but as "Assignment of Error V" in his legal argument.

2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph two of the syllabus.

{¶62} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Id.* at ¶ 26. In *Ruff*, the Supreme Court held that if a defendant's conduct supports multiple offenses, the defendant can be convicted of all of the offenses if any one of the following is true: "(1) the conduct constitutes offenses of dissimilar import or significance, (2) the conduct shows the offenses were committed separately, or (3) the conduct shows the offenses were committed with separate animus or motivation." *Id*. at paragraph three of the syllabus, citing R.C. 2941.25(B).

{¶63} When determining whether two offenses are allied offenses of similar import, we apply a de novo standard of review. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶64} R.C. 2923.16 states in relevant part,

(A) No person shall knowingly discharge a firearm while in or on a motor vehicle.

(B) No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle.

{¶65} As discussed above, there is no question that Jenkins's conduct in this case supports his convictions under both subsections of R.C. 2923.16. Thus, we must determine if any of the three *Ruff* factors are present such that the trial court properly sentenced Jenkins for both offenses.

{¶66} Under *Ruff*, Jenkins's convictions under R.C. 2923.16 are not allied offenses of similar import because they were committed separately and with separate animus or motivation.

Based on the evidence establishing that Jenkins fired a firearm from his vehicle, we can infer that Jenkins had a firearm that was loaded prior to his decision to shoot from inside of his vehicle in violation of R.C. 2923.16(B). The conduct and animus underlying that offense is different from the conduct and animus underlying his conviction under R.C. 2923.16(A), which Jenkins committed when he discharged that firearm while inside his vehicle. Put simply, Jenkins made two separate decisions: first, to place a loaded firearm in his vehicle that he had access to and, second, to fire that firearm into a crowd while driving his vehicle. Those separate forms of conduct and motivations support the conclusion that Jenkins's convictions under R.C. 2923.16 are not allied offenses of similar import.

{¶67} Accordingly, we overrule Jenkins's fifth assignment of error. **F.          Jenkins's Sentence**

{¶68} In his sixth assignment of error, Jenkins contends that his consecutive sentences for his attempted murder convictions were contrary to law and not properly imposed because (1) the record does not support the trial court's findings under R.C. 2929.14(C)(4) and (2) "the imposition of a maximum, consecutive sentence" was not supported under R.C. 2929.11 and 2929.12.

{¶69} An appellate court must conduct a meaningful review of the trial court's sentencing decision. *State v. Johnson*, 8th Dist. Cuyahoga No. 97579, 2012-Ohio-2508, ¶ 6, citing *State v. Hites*, 3d Dist. Hardin No. 6-11-07, 2012-Ohio-1892. R.C. 2953.08(G)(2) provides that our review of consecutive sentences is not an abuse of discretion. Instead, an appellate court must "review the record, including the findings underlying the sentence or modification given by the sentencing court." *Id.* If an appellate court clearly and convincingly finds either that (1) "the record does not support the sentencing court's findings under [R.C. 2929.14(C)(4)]," or (2) "the

sentence is otherwise contrary to law," then "the appellate court may increase, reduce, or otherwise modify a sentence * * * or may vacate the sentence and remand the matter to the sentencing court for resentencing." *Id.* The Ohio Supreme Court has further explained that

> some sentences do not require the findings that R.C. 2953.08(G) specifically addresses. Nevertheless, it is fully consistent for appellate courts to review those sentences that are imposed solely after consideration of the factors in R.C. 2929.11 and 2929.12 under a standard that is equally deferential to the sentencing court. That is, an appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellant court finds by clear and convincing evidence that the record does not support the sentence.

*State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 23.

{¶70} We first analyze Jenkins's argument that the imposition of a maximum, consecutive sentence is contrary to law. Trial courts have full discretion to impose the maximum sentence as long as it remains within the statutory range and are not required to make findings and give reasons for imposing more than the minimum sentence. *State v. Pavlina*, 8th Dist. Cuyahoga No. 99207, 2013-Ohio-3620, ¶ 15, citing *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. Here, the trial court's sentence for Jenkins's offenses were within the permissible statutory range.

{¶71} When sentencing a defendant, the court must consider the purpose and principles of felony sentencing set forth in R.C. 2929.11 and the serious and recidivism factors in R.C. 2929.12. *State v. Hodges*, 8th Dist. Cuyahoga No. 99511, 2013-Ohio-5025, ¶ 7. R.C. 2929.11(A) and (B) states that the "overriding purposes of felony sentencing are to protect the public from future crime by the offender and others to punish the offender using the minimum sanctions that the court determines accomplish those purposes" and requires that the sentence be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim."

**{¶72}** R.C. 2929.12 sets forth a nonexhaustive list of factors that the court must consider in relation to the seriousness of the underlying crime and likelihood of recidivism, including "(1) the physical, psychological, and economic harm suffered by the victim, (2) the defendant's prior criminal record, (3) whether the defendant shows any remorse, and (4) any other relevant factors." *State v. Kronenberg*, 8th Dist. Cuyahoga No. 101403, 2015-Ohio-1020, ¶ 26, citing R.C. 2929.12(B) and (D).

**{¶73}** Trial courts, however, are not required to make factual findings under R.C. 2929.11 or 2929.12 before imposing the maximum sentence. *Id*. at ¶ 27. In fact, "[c]onsideration of the factors is presumed unless the defendant affirmatively shows otherwise." *State v. Seith*, 8th Dist. Cuyahoga No. 104510, 2016-Ohio-8302, ¶ 12, citing *State v. Keith*, 8th Dist. Cuyahoga Nos. 103413 and 103414, 2016-Ohio-5234. "[T]his court has consistently recognized that a trial court's statement in the journal entry that it considered the required statutory factors, without more, is sufficient to fulfill its obligations under the sentencing statutes." *Kronenberg* at ¶ 27, citing *State v. Wright*, 8th Dist. Cuyahoga No. 100283, 2014-Ohio-3321.

**{¶74}** Jenkins's entire argument addressing R.C. 2929.11 and 2929.12 consists of two sentences. The first is that his 19-year sentence "is more than the minimum sanction that would be required to accomplish the purposes of R.C. 2929.11." The second is that "[t]he factors of R.C. 2929.12 do not support the imposition of a maximum sentence." Based on our discussion in the previous section, which is relevant here as well, we disagree. The court discussed the fact that Jenkins was a repeat violent offender based on his criminal history, which included convictions for aggravated robbery, robbery, aggravated burglary, and kidnapping and a three-year firearm specification. It also discussed his conduct underlying his convictions that put many people's lives at risk. While he did not kill anyone or cause any serious injuries, he

still shot two "innocent people" when he decided to discharge his firearm multiple times from a moving vehicle toward a crowd of 20 people. Accordingly, we find that the trial court considered R.C. 2929.11 and 2929.12 and properly imposed a maximum, consecutive sentence.

{¶75} Turning to the trial court's imposition of consecutive sentences, R.C. 2929.14(C)(4) provides that in order to impose consecutive sentences, the trial court must find (1) that consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) that such sentences would not be disproportionate to the seriousness of the conduct and to the danger the offender poses to the public, and (3) that one of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under postrelease control for a prior offense;

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct;

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶76} Jenkins argues that "the court did not adequately explain why his conduct required the imposition of consecutive sentences or how this will protect the public." In support, he argues that imposing consecutive sentences results in a very long sentence, he is only 23 years old, he would not receive good time credit, he has his GED, he did not cause any injuries, and he expressed sympathy for the situation.

{¶77} Contrary to Jenkins's mitigating points, a trial court is no longer required to provide reasons for imposing consecutive sentences. *See State v. West*, 8th Dist. Cuyahoga No.

105568, 2018-Ohio-956, ¶ 21, citing *State v. Goins*, 8th Dist. Cuyahoga No. 98256, 2013-Ohio-263. Further, after review, we find that the record clearly and convincingly supports the trial court's findings under R.C. 2929.14(C)(4). When imposing consecutive sentences, the trial court discussed Jenkins's criminal history and repeat violent offender specification as well as the dangerous conduct that gave rise to his convictions, including his shooting into a crowd and of two "innocent people[.]" Therefore, the record clearly and convincingly supports the trial court's imposition of consecutive sentences.

{¶78} We therefore overrule Jenkins's sixth assignment of error.

### G. Right to Remain Silent

{¶79} In his final assignment of error, Jenkins argues that Detective Miller's comment — "Mr. Jenkins knows where he went. Other than that, I'm not aware of anyone who does." — violated his constitutional right to remain silent.

{¶80} The Fifth Amendment to the Constitution of the United States provides that no person "shall be compelled in any criminal case to be a witness against himself[,]" and applies to the states through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). According to the United States Supreme Court's interpretation, the Fifth Amendment provides criminal suspects certain rights and protections while in police custody. *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). These rights include the right to remain silent and the right to have counsel present during the interrogation. *Id.* at 467-468.

{¶81} A defendant's decision to exercise his right to remain silent during police interrogation is generally inadmissible at trial either for the purpose of impeachment or as substantive evidence of guilt. *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d

335, ¶ 16-18; *see also Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). Further, evidence introduced by the state during its case-in-chief regarding the defendant's exercise of his right to remain silent during interrogation violates the Due Process Clause of both the U.S. and Ohio Constitutions. *Leach* at ¶ 18. This rule enforces one of the Fifth Amendment's underlying policies, which is to avoid any assumption by the jury that a defendant's silence equates with guilt. *Id.* at ¶ 31.

{¶82} Detective Miller's comment occurred during redirect examination, during which the following exchange took place:

STATE:    And are you aware where the defendant went after leaving the scene of the Phantasy after the first altercation?

MILLER:    I have no idea where he went.

STATE:    Does anybody know where he went? Did you learn that?

MILLER:    Mr. Jenkins knows where he went. Other than that, I'm not aware of anyone who does.

{¶83} To summarize, when asked whether he knew of any witnesses who knew where Jenkins went after the fight at the Phantasy, Miller pointedly answered that he was not aware of anyone besides Jenkins who could account for his whereabouts. We find that Detective Miller's statement was not a comment on Jenkins's right to remain silent. Unlike cases where courts have found a witness's comment to concern a defendant's right to remain silent, Detective Miller's comment did not concern Jenkins's refusal to speak to police or his decision not to testify. *See State v. Plott*, 3d Dist. Seneca Nos. 13-15-39 and 13-15-40, 2017-Ohio-38, ¶ 87 (overruling the appellant's assignment of error because the officer's statement that the appellant "said he was coming to turn himself in and that he wasn't going to talk to me without his attorney" was a "single, isolated comment."); *State v. Sanders,* 2d Dist. Montgomery No. 26666,

2016-Ohio-4724, ¶ 48 (finding that the detective's comment — "I attempted to interview Mr. Sanders.  He did not want to speak to us." — touched upon the defendant's right to remain silent); *State v. Graber*, 5th Dist. Stark No. 2002CA00014, 2003-Ohio-137, ¶ 97 (overruling the assignment of error based on the officer's statement that the defendant "refused to come in and speak with us" because the comment did not rise to the level of plain error). Instead, his comment was responsive to the question asked, which concerned his investigation and who knew where Jenkins went after his fight with Super at the Phantasy.   Accordingly, we overrule Jenkins's seventh assignment of error.

{¶84} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.   The defendant's conviction having been affirmed, any bail pending appeal is terminated.   Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, JUDGE

TIM McCORMACK, P.J., and
MELODY J. STEWART, J., CONCUR