[Cite as *State v. Williams*, 2019-Ohio-10.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 106998

---

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**OCIE WILLIAMS**

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-616093-A

**BEFORE:** Kilbane, A.J., S. Gallagher, J., and Jones, J.

**RELEASED AND JOURNALIZED:** January 3, 2019

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
820 West Superior Avenue, Suite 800
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
Jillian Eckart
Mary M. Frey
Assistant County Prosecutors
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, A.J.:

{¶1} Defendant-appellant, Ocie Williams ("Williams"), appeals his convictions following a jury trial. For the reasons that follow, we affirm.

{¶2} In April 2017, Williams was charged with four counts of aggravated burglary, three counts of felonious assault, two counts of kidnapping, all with firearm specifications attached. Williams was also charged with one count of improper discharging a firearm into a habitation and one count of having weapons while under disability.

{¶3} Williams pleaded not guilty at the arraignment, and the matter proceeded to a jury trial on all the charges, except that of having weapons while under disability, which was tried to the bench. At the jury trial, through the testimony of 12 witnesses, the following information was adduced.

{¶4} Shortly after midnight on April 3, 2017, patrol officers from the Cleveland Police Department ("CPD") responded to an address on East 119th Street in Cleveland, Ohio, on report

of a burglary and of shots fired. When the officers arrived, a male was lying on the floor in a pool of blood, and he had sustained three gunshot wounds. The male, later identified as Joseph Hurns ("Hurns"), was conscious, but not responsive. The officers applied first aid until the emergency medical service ("EMS") arrived and transported Hurns to the hospital. The officers recovered three spent cartridges in the front yard, one bullet stuck in the carpet, and one lodged in the wall. The officers also observed three bullet holes in the front door.

{¶5} The officers obtained information from a witness to the shooting that the suspect was Williams. The witness, later identified as Russell Porch ("Porch"), gave the officers a description of the vehicle Williams had been driving and a potential address linking him to a Cuyahoga Metropolitan Housing Authority ("CMHA") property on West 25th Street.

{¶6} The officers relayed this information to the CMHA police, who later notified them that Williams was at the property. CPD officers arrested Williams at the CMHA property. While in custody, Williams stated he had been present at the house on East 119th Street, had seen men pistol whip Hurns, and that other men fired gun shots into the house. The CPD later obtained a search warrant for Williams's apartment, but did not find any evidence upon its execution. The CPD subsequently developed a photo array and showed it to Hurns, who identified Williams as the shooter.

{¶7} Hurns, 69 years old at the time of trial, testified that for approximately six weeks prior to the incident, he had been renting a bedroom in the house on East 119th Street from Tina Ronny ("Tina"), who was the tenant actually renting the property. Hurns testified that Williams was Tina's boyfriend who would often spend the night at the house and that he had seen Williams about ten times prior to the incident on April 3, 2017. Hurns testified that a week prior

to the incident, he and his friend Russell Porch ("Porch") had decided to move to Columbus, Ohio, but had not made that fact public.

{¶8} Hurns testified that on April 2, 2017, he and Porch were at the laundromat, when Tina called to ask if he could pick her up from the train station. Hurns picked up Tina from the train station and drove back to the house. Hurns testified that when they arrived at the house, Tina asked to borrow his car, and he agreed.

{¶9} Hurns testified that while he and Porch were waiting for Tina to return with his car so he could leave for Columbus, Williams arrived. Williams, accompanied by a man Hurns had not seen before, asked for Tina. Hurns testified that when he told Williams that Tina was not at home and that she had borrowed his car to go to her mother's house, Williams proceeded to search every room, while the other man appeared to be just watching and listening. Williams and the other man then left the house.

{¶10} Hurns testified that approximately two hours later, Williams and the other man returned. Williams asked if Tina was back. Hurns testified that when he told Williams Tina had not made it back, Williams stated that "[S]he stole your car, man, because she stole my $11,000 watch." Williams stayed about 15 minutes and then left.

{¶11} Hurns testified that about an hour after Williams left the house the second time, he heard what appeared to be the sound of keys rattling. Believing it was Tina, Hurns proceeded to unlock the door. Hurns testified that Williams pushed past him and the other man stood in the doorway. Williams began looking throughout the house for Tina and stated that "[S]he stole your car, you ain't got no car, she took my watch, she stole your car."

{¶12} Hurns testified that as Williams was about to leave, he turned around and said, "[H]ell with that," and Williams pulled out a gun and hit him in the head, causing him to fall to

the floor.   Williams then walked out.   Hurns testified that while attempting to get off the floor, he heard gunshots and realized he had been shot when he felt a burning sensation and saw blood oozing from his arm.   Hurns testified that he heard four gunshots.

{¶13} The jury found Williams guilty of all four counts of aggravated burglary, with the firearm specifications attached; two counts of felonious assault, with the firearm specifications attached, and guilty of improperly discharging into habitation with the firearm specifications attached.   The trial court also found Williams guilty of the bifurcated count of having weapons while under disability.   The trial court sentenced Williams to a total prison term of ten years, with five years of postrelease control.

{¶14} Williams now appeals assigning the following errors for our review.

Assignment of Error One

The State failed to present sufficient evidence to sustain a conviction against [Williams].

Assignment of Error Two

[Williams's] convictions are against the manifest weight of the evidence.

Assignment of Error Three

[Williams's] rights against self-incrimination were violated when the trial court imposed a harsher sentence after it found that appellant had no remorse.

Sufficiency of Evidence

{¶15} In the first assignment of error, Williams argues that the state failed to present sufficient evidence to sustain the convictions.

{¶16} A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law.   *State v. Amey*, 8th Dist. Cuyahoga No. 105847, 2018-Ohio-4207, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541

(1197). In reviewing a sufficiency challenge, "'[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Thompkins*, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶17} In the instant case, the jury found Williams guilty of felonious assault in violation of R.C. 2903.11(A)(2), which provides:

(A) No person shall knowingly do either of the following:

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

{¶18} Hurns testified that as Williams was about to leave the house the third time that day, Williams turned and knocked him in the head with a gun, causing him to fall to the floor. Hurns also testified gunshots were fired into the house within moments of Williams exiting the house. The evidence established that three of the four bullets fired into the residence struck Hurns, who had to undergo life-saving surgery.

{¶19} In addition, Porch, whose testimony comports with Hurns's, also testified Williams knocked Hurns several times in the head with a gun. Porch also testified that gun shots were fired into the house within moments of Williams and his companion exiting the house.

{¶20} Viewing this evidence in a light most favorable to the prosecution, we find a rational trier of fact could have found the essential elements of felonious assault was proven beyond a reasonable doubt.

{¶21} Nonetheless, Williams claimed the state's evidence was not sufficient because the state did not produce any physical evidence that he possessed a firearm, no gunshot residue, or any DNA.

**{¶22}** However, Williams's claim lacks merit. Physical evidence is not required to sustain a conviction. *State v. Binford*, 8th Dist. Cuyahoga No. 105414, 2018-Ohio-90, citing *State v. Lopez*, 8th Dist. Cuyahoga No. 94312, 2011-Ohio-182, ¶ 62, citing *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. "Proof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence or any combination of these three classes of evidence." *Jenks* at 272.

**{¶23}** In addition, at trial, CPD detective, Todd Clemens, explained that the department did not perform a gun residue test on Williams because the residue would most likely have been lost between the time the shots were fired and when Williams was apprehended several hours later.

**{¶24}** Further, Williams's expert witness, Jessica York ("York"), of the DNA Diagnostic Center, hired to conduct DNA testing on the spent cartridges and bullets recovered at the scene, explained how the lack of DNA was possible. York, who was unable to obtain DNA from two of the three cartridges and one of the two bullets, but partial DNAs from the third cartridge and second bullet, opined:

> [YORK]: [P]otentially I know if you had DNA, it passes through an item, the ability to obtain DNA profile would probably be harder. I would expect that that DNA, if on there prior to passing through — prior to passing through the door, then it could — the door itself could retain some of the biological material or the fluids that were on there. If it passes through the door prior to DNA being deposited, I wouldn't expect anything, but if it happened after the DNA was — or potential DNA was on the bullet, then I would anticipate it to then reduce or make it harder to obtain the DNA profile from the item.

**{¶25}** Here, given that the gunshots were fired through the closed door, entered and then exited through Hurns's body, it is quite possible, as York opined, for DNA to be picked up or lost after coming in contact with other surfaces or other persons.

**{¶26}** The above testimony, if believed, is sufficient to sustain the conviction for felonious assault.

**{¶27}** The jury also found Williams guilty of aggravated burglary in violation of R.C. 2911.11(A)(2), which provides:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> * * *
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

**{¶28}** Williams argues there was no evidence presented that he entered the residence by force, stealth, or deception.

**{¶29}** However, Hurns's testimony negates Williams's argument. Hurns testified that after Williams left the second time, he locked both doors because Williams had become increasingly angry. When he heard what sounded like keys rattling, he remarked to Porch that it must be Tina, who always had trouble with her key, so he opened the inside door, but was surprised that it was Williams. Hurns testified that Williams was determined to get into the house because the outer steel door had been locked.

**{¶30}** Relevantly, Hurns testified as follows:

> [HURNS]: The door it had like a mesh, a steel mesh on the outside of the steel door like a mesh. And it was pushed in, okay, it was pushed in and, you, know, and you could slide your hand and now unlock the steel door. And I know that's what he did.
>
> [STATE]: At some point on April 3rd, you had locked the front door?

[HURNS]: Very much so. After the second time he came, I decided to keep that door locked, I should have mentioned that. You know, I know the door was locked. And that steel mesh was not moved, okay, that's why it didn't bother me just to open the door and say she still ain't here, man, you see the car, that's exactly what he was coming out with when he came walking right on in.

{¶31} The above excerpt, if believed, provided sufficient evidence that Williams gained entrance, by force, despite Hurns's attempt to prevent him access by locking both doors after Williams left the second time. As such, there was sufficient evidence to sustain the conviction for aggravated burglary.

{¶32} Accordingly, the first assignment of error is overruled.[1]

### Manifest Weight of Evidence

{¶33} In the second assignment of error, Williams argues his convictions were against the manifest weight of the evidence.

{¶34} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Riedel*, 8th Dist. Cuyahoga No. 104929, 2017-Ohio-8865, citing *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Bowden*, citing *Thompkins*, 78 Ohio St.3d at 388, 678 N.E.2d 541. A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at

---

[1] Williams does not separately challenge his conviction for having weapons while under disability, therefore, we summarily affirm this conviction. In addition, except for his blanket statement in the first assigned error that all his convictions should be vacated, Williams does not separately raise any argument relating to his conviction for improperly discharging into a habitation. Based on our resolution of the first assigned error, we also affirm this conviction.

547.

{¶35} Williams argues that Hurns's and Porch's testimonies are unreliable because they admitted to having substance abuse challenges. Despite their substance abuse challenges, both men offered substantially the same testimony regarding the events transpiring that night.

{¶36} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the

trier of fact. *State v. Burks*, 8th Dist. Cuyahoga No. 106639, 2018-Ohio-4777, citing *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

{¶37} Further, the trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.*, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *Burks* at ¶ 48, citing *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶38} William again raises the lack of DNA evidence, which we have already addressed in the first assignment of error.

{¶39} After reviewing the record, we cannot say that Williams's convictions for felonious assault and aggravated burglary are against the manifest weight of the evidence. The jury heard the witnesses's testimony and was able to take into account any inconsistencies and assess the credibility of the witnesses. Thus, we cannot say that this is the exceptional case where the

evidence weighs heavily against the convictions, nor that the jury clearly lost its way and created a manifest miscarriage of justice.

{¶40} Accordingly, the second assignment of error is overruled.

Sentence

{¶41} In the third assignment of error, Williams argues the trial court imposed a harsher sentence after a finding of lack of remorse. We find no merit to Williams's argument.

{¶42} When sentencing a defendant, the court must consider the purpose and principles of felony sentencing set forth in R.C. 2929.11 and the serious and recidivism factors in R.C. 2929.12. *State v. Jenkins*, 8th Dist. Cuyahoga No. 105881, 2018-Ohio-2397, citing *State v. Hodges*, 8th Dist. Cuyahoga No. 99511, 2013-Ohio-5025, ¶ 7. R.C. 2929.11(A) and (B) states that the "overriding purposes of felony sentencing are to protect the public from future crime by the offender and others to punish the offender using the minimum sanctions that the court determines accomplish those purposes" and requires that the sentence be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim * * *."

{¶43} R.C. 2929.12 sets forth a nonexhaustive list of factors that the court must consider in relation to the seriousness of the underlying crime and likelihood of recidivism, including "(1) the physical, psychological, and economic harm suffered by the victim, (2) the defendant's prior criminal record, (3) whether the defendant shows any remorse, and (4) any other relevant factors." *Jenkins* at ¶ 72, citing *State v. Kronenberg*, 8th Dist. Cuyahoga No. 101403, 2015-Ohio-1020, ¶ 26, citing R.C. 2929.12(B) and (D).

{¶44} In the instant case, the state asked the court to impose a sentence in the range of 15 to 20 years because one of the bullets struck one of Hurns's major arteries, causing him to almost

bleed to death.   Yet, the trial court imposed a prison term of just one year above the minimum sentence.

**{¶45}** Williams's contention that he was punished for displaying a lack of remorse is not borne out by the record.   At the sentencing hearing, the following exchange took place:

[COURT]: Would you like to say anything on your own behalf, Mr. Williams?

[WILLIAMS]: No.

[COURT]: No?

[WILLIAMS]: Yes, I would like to say something.

[COURT]: This is your choice.

[WILLIAMS]: No, sir.

[COURT]: Now let the record reflect that people in the back of the room telling you not to say anything.  As I indicated to you at the appropriate time during the trial when it was your moment of truth and your moment to take the witness stand, and your counsel indicated that you were going to exercise your Fifth Amendment rights not to speak.  I made sure that I had interaction with you, directly, to make sure that that was your decision, not anybody else's.  And I want to make this clear.  Every defendant convicted of a crime has an opportunity for allocution, to present mitigation.  And so this is your opportunity.  No one else's.  Not your pastor's.  No one else in the back of the room.  So, if you want to say something, you say it now.

[WILLIAMS]: I thank you for going over, watching, I mean, I appreciate you. I'm asking for mercy of the Court.  That's all I could do.  They don't want me to say nothing, I'm not going to say nothing because I got a lot to say.  Because this right here, don't make no sense.  Ain't no way in the world.  61 years old.  I don't touch guns.  I don't like guns.  I don't like guns.  And this is why I would never do this.

**{¶46}** After the above exchange, the trial court indicated it was sorry to hear Williams's response, then proceeded to point out it believed in the adversarial system, though fallible.   The trial court noted that it would likely never know who Williams was with or who fired the shots into the house, but underscored that the advent of the body camera was probably one of the most

important advancements in the criminal justice system. The trial court stated that, in this case, the body camera had captured Williams admitting that he was present at the house and that he had gone to the house three times that night looking for a woman because his watch had come up missing.

**{¶47}** Prior to imposing sentence, the trial court stated:

[COURT]: And just so you're aware, I don't just impose a criminal sentence from a gut reaction. I take into consideration all of the mitigation, all of the — I have to listen to what the victims are going to have to deal with for the rest of their lives. They didn't deserve that. The psychological impact that they're going to have to suffer for the rest of their lives. * * * I take into consideration the fact that you haven't led a violent life as your attorney said. Nothing would indicate that the length of this sentence the State is asking for today is necessary to protect the public in light of your past behavior. * * * [O]ne thing the law isn't about vengeance. The criminal sentence is not about vengeance, okay, and it's not all about mercy. The judge has to exercise compassion.

**{¶48}** Our review indicates the trial court considered the factors set forth in R.C. 2929.12. We find nothing in the record to support Williams's claim that he received a harsher sentence for displaying a lack of remorse.

**{¶49}** Accordingly, the third assignment of error is overruled.

**{¶50}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, ADMINISTRATIVE JUDGE

SEAN C. GALLAGHER, J., and
LARRY A. JONES, SR., J., CONCUR