[Cite as *State v. Dorsey*, 2021-Ohio-878.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No. L-19-1117

      Appellee                                    Trial Court No. CR0201802410

v.

Jeromain Dorsey                                **DECISION AND JUDGMENT**

      Appellant                                   Decided:  March 19, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Emil G. Gravelle III, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Jeromain Dorsey, appeals the May 15, 2019 judgment of the

Lucas County Court of Common Pleas sentencing him to an aggregate prison term of ten

years.  For the following reasons, we affirm.

## I.  Background and Facts

{¶ 2} On August 1, 2018, Dorsey and his codefendant, Raheem Belmon, were each indicted on one count of second-degree felonious assault in violation of R.C. 2903.11(A)(2), with a three-year firearm specification under R.C. 2941.145, in connection with the July 3, 2018 shooting of D.B. that left D.B. almost totally paralyzed from the shoulders down.

{¶ 3} D.B. contracted an infection related to his injuries and was hospitalized before Dorsey and Belmon were brought to trial, so the parties conducted a trial deposition of D.B.  He testified that he was 18 years old; at the time of the shooting, he was a 17-year-old high school student.  He admitted that he had posted pictures on his Facebook page of himself with guns and displaying gang symbols because he "just wanted to," and said that he had "friends that's in a gang" and he was "surrounded by it," but D.B. denied being a gang member.

{¶ 4} D.B. said that he and Belmon were friends, and, although D.B. was Facebook friends with Dorsey, they did not have any other relationship and they had never met in person before the shooting.  According to D.B., Dorsey befriended him on Facebook, but he could not recall how long before the shooting they became Facebook friends.  D.B. was not fighting with Belmon or Dorsey before the shooting and did not have any other problems with either man.

2.

{¶ 5} On July 3, Belmon contacted D.B. through Facebook to tell him that he had "some females waiting * * *." Belmon later told D.B. to delete all of their messages from Facebook and not to tell anyone that they were together.

{¶ 6} D.B. agreed to meet with Belmon, who arrived awhile later in a car driven by a man D.B. did not know. D.B. could not recall the model or color of the car. Because D.B. did not know the driver, he did not trust him, and although D.B. did not know where he and Belmon were going, he suggested that they walk. When D.B. said that they should walk, he first testified that Belmon "[t]ook a gun out the backseat of the car[,]" but when the prosecutor followed up by asking if D.B. was "saying that Raheem Belmon got back in the car and got a gun out of the backseat[,]" D.B. responded, "[t]he trunk."

{¶ 7} According to D.B., this all happened "[l]ate at night" in an area with no streetlights, so it was dark. While they were walking, D.B. said that "[s]omething told me to turn around. So I turned around. I told [Belmon] somebody's following us." D.B. said that Belmon told him to duck behind some bushes and Belmon "pulled out his gun, like he [was] about to try to protect [D.B.], but really he [was] helping * * *" the person walking toward them. The prosecutor asked D.B. if he was able to see who the person coming toward them was once that person got closer, and D.B. responded, "Jeromain Dorsey." Dorsey failed to appear for the deposition, so he was not in the room at the time, leading the prosecutor to show D.B. Dorsey's jail booking photograph to confirm that the person he identified as "Jeromain Dorsey" was Dorsey. Although this was the

3.

first time that D.B. had visually identified the second person involved in the shooting, Dorsey's attorney did not object to the identification.

{¶ 8} On cross-examination, D.B. explained that the shooter he identified as Dorsey was approximately 20 feet away from him, and he confirmed that there were no streetlights and the area was dark. He said that he could not remember what clothing the shooter was wearing, what type of hairstyle he had, or whether he had facial hair, but he remembered that the shooter was not wearing glasses or a hat. D.B. specifically testified that he saw the shooter's face and remembered what he looked like.

{¶ 9} When Dorsey was close to D.B. and Belmon, both men turned their guns on D.B., so D.B. ran. He attempted to jump a fence, but got stuck. He said that both men were shooting at him while he was stuck on the fence, but that Belmon stopped shooting, and that's when Dorsey "shot [D.B.] in the neck" and D.B.'s "whole body collapsed on the ground." D.B. testified that he "thought [he] was dead or about to die * * *." Neither Dorsey nor Belmon said anything to D.B. before or during the shooting.

{¶ 10} Belmon and Dorsey left D.B. lying on the ground, but returned later with a third man. D.B. recognized all three men's voices. D.B. played dead, and the men believed that he was dead. They went through D.B.'s pockets, and the third man took D.B.'s cellphone. Then, the three men left.

{¶ 11} On cross, D.B. said that whoever had taken his phone also deleted the Facebook messages between him and Belmon. He also confirmed that the only time he had ever heard Dorsey speak was while Dorsey was shooting at him, but he claimed that

4.

he recognized Dorsey's voice among the voices of the men who returned to rifle through his pockets after the shooting.

{¶ 12} D.B. laid on the ground calling for help for approximately six hours before someone found him and called 911. Officers from the Toledo Police Department ("TPD") responded to the scene and waited with D.B. until medical help arrived. In response to the prosecutor's questions, D.B. indicated that the detective asked him who had shot him and that he told the detective "Jeromain Dorsey and Raheem Belmon." A TPD officer met with D.B. after the shooting and showed him a photo array from which D.B. identified Belmon as one of the men who shot at him on July 3.

{¶ 13} As a result of the gunshot wound, D.B. is almost totally paralyzed. He said that he has some ability to move his left hand, but is unable to move his right hand or his feet. He had been hospitalized with two infections since the shooting, and had stayed in two rehabilitation facilities during his recovery. [1]

{¶ 14} A week after the deposition and four days before trial, Dorsey filed a motion to suppress D.B.'s identification of him as the shooter. He argued that D.B.'s identification was unreliable because (1) D.B. made a full identification of Dorsey as the

---

[1] Although D.B. did not provide much detail about his injuries in his testimony, at trial, the parties stipulated to the admission of over 10,000 pages of D.B.'s medical records, which show that the bullet severed D.B.'s spinal cord at the level of his C7-T1 vertebrae, leaving him with some gross motor movement in his left shoulder, but no ability to move his other extremities and no sensation below his nipple line. The records—that account for only the first 33 days after D.B. was shot—also detail numerous tests and surgical procedures performed on D.B. and the difficulty he had adjusting to his new circumstances.

5.

shooter for the first time at the deposition, which was nine months after the shooting; (2) D.B. gave the name "Jeromain Dorsey" at the time of the shooting, but did not provide a physical description of the shooter, and police did not show D.B. a photo array from which D.B. could have identified the "Jeromain Dorsey" who shot him, so it was unclear if D.B. meant the same Jeromain Dorsey who was arrested and indicted for the crime; and (3) D.B. identified Dorsey as the shooter only after the prosecutor showed him Dorsey's mugshot during the deposition, which was unduly suggestive.

{¶ 15} The state responded that D.B.'s identification of Dorsey at the deposition was not impermissibly suggestive because Dorsey chose not to appear at the deposition, so the only means of identification available to the state was Dorsey's photograph, and D.B.'s identification of Dorsey had indicia of reliability because D.B. was familiar with Dorsey from Facebook and had consistently named "Jeromain Dorsey" as the shooter.

{¶ 16} Dorsey's and Belmon's cases were tried together to a jury. The morning of the trial, the trial court heard arguments on Dorsey's motion to suppress. After hearing from counsel, the court denied the motion because D.B. made the identification in court, Dorsey—by his own choice—was not present at the proceeding at which D.B. identified him, forcing the state to use the photograph of Dorsey that it had available so that D.B. could make the identification, and, under the circumstances, it was a "stretch" to say that D.B.'s identification was "somehow suggestive" or prejudicial to Dorsey's defense.

{¶ 17} At trial, the state presented the testimony of the 911 operator who answered the call about D.B.'s shooting; TPD officers, Anthony Walden and Benjamin Woody;

6.

TPD detective, Paul Marchyok; and Belmon's ex-girlfriend. The state also played the video of D.B.'s deposition for the jury in lieu of D.B.'s live testimony. The following facts were elicited at trial.

{¶ 18} At approximately 9:30 a.m. on July 4, 2018, a passerby called 911 to report that he heard someone calling for help. The person was lying between a house and a fence and said that he had been shot. The passerby had not heard any gunshots or seen anyone other than the person requesting help.

{¶ 19} Officers Walden and Woody, along with TPD detective Larry Anderson, responded to the 911 call. They found D.B. on the ground in a narrow space between a fence and an abandoned house. When Woody first saw D.B., he thought that D.B. was dead, but when D.B. realized that the police were there, he started crying and asking for help. Based on his prior experience with shooting victims, Walden "didn't think [D.B.] was going to make it." After Woody got D.B.'s name, Anderson—who did not testify— asked D.B. if he knew who shot him. Woody testified that D.B. said "it was Raheem Dorsey," and Walden testified that D.B. responded, "Raheem and Dorsey." Walden and Woody both initially thought that "Raheem Dorsey" was one person. Woody went to his police car to look up "Raheem Dorsey" on his computer, but did not get any hits. Woody told D.B. and Anderson that "there is no Raheem Dorsey[, and t]hat's when [D.B.] says it was Raheem and Dorsey." At that point, Walden and Woody realized that they were looking for two shooters, not one.

7.

{¶ 20} Woody also testified that he asked D.B. where the shooting happened because the officers could not determine the location of the shooting. According to Woody, D.B. responded that "Raheem set me up; it was a drug deal gone bad, and he said Dorsey was in the bushes waiting for me." Although D.B. did not mention meeting up with females when officers spoke to him before he was taken to the hospital, Woody said that he did not always get all pertinent information from shooting victims who were in the "throws [sic] of death" because officers "don't ask certain things or [victims] might just leave stuff out. Sometimes they're so scared, they're just giving a little bit." He agreed with the prosecutor that officers speak to shooting victims who survive at a later date, and that victims sometimes give a "fuller statement."

{¶ 21} The officers did not find any weapons on D.B. or in the area where he was lying. Nor were they able to find any spent bullets or casings in the yard where they found D.B. Walden said that several of the houses in the area were abandoned, the grass in the yard was overgrown, and there were a lot of bushes and shrubs, which made looking for casings "pretty hard," and that casings are "pretty small to locate even in the best of conditions." Woody agreed that there was nothing unusual about the officers being unable to find casings because of the overgrown grass and shrubs and "[b]ecause they're so hard to see anyways * * *."

{¶ 22} Walden could not recall if there were any streetlights in the area where D.B. was found, but Woody testified that he knew that the alley behind the house where D.B. was found—which he presumed was the direction that D.B. had run from—did not

8.

have any streetlights. Woody also said that it was difficult to see much of D.B. when the officers found him because of the overgrown grass and because it was "really dark" in the area where they found him.

{¶ 23} Walden did not see any bullet holes in the house that D.B. was found next to, but agreed with the prosecutor that there might not be bullet holes in a house if someone is shot in the neck. Officers found one of D.B.'s shoes in the backyard of the house that D.B. was found beside, on the side of the fence opposite where D.B. landed. D.B. did not tell officers how many times that he was shot at, but said that "he was being shot at by both of the suspects that he named[,]" which Walden interpreted as meaning that D.B. had been shot at multiple times.

{¶ 24} Marchyok was the detective who showed D.B. the photo array related to Belmon. During Dorsey's cross-examination, Marchyok testified that he sometimes used a single photograph to identify suspects when the suspect was a "known person." For example, if a victim said the perpetrator was his neighbor, but did not know the neighbor's name, Marchyok "might look that person up and print out a single photograph to make sure I have the right person that [the victim is] talking about." He also testified that he did not present any other photo arrays related to this case.

{¶ 25} Following the presentation of evidence, the jury found Dorsey guilty of complicity to commit felonious assault and the attached firearm specification. The trial court sentenced him to a prison term of seven years for the complicity to commit

9.

felonious assault conviction and a prison term of three years for the firearm specification, resulting in an aggregate prison term of ten years.

{¶ 26} Dorsey now appeals, raising four assignments of error:

1. The victim's first time in-court identification of Appellant Dorsey was improper, prejudicial, and a violation of Appellant Dorsey's right to due process and a fair trial pursuant to the Ohio and United States Constitutions.

2. Appellant's Conviction for Felonious Assault was Based on Insufficient Evidence.

3. Appellant's Conviction for Felonious Assault was Against the Manifest Weight of Evidence.

4. The acts and omissions of trial counsel deprived Appellant of his right to effective assistance of counsel in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 and Section 16 of the Ohio Constitution.

### III. Law and Analysis

### A. D.B.'s identification of Dorsey was properly admitted.

{¶ 27} In his first assignment of error, Dorsey argues that the trial court committed plain error by admitting D.B.'s identification of him from D.B.'s trial deposition because the identification procedure the state used was unduly suggestive. The state counters that the trial court did not commit plain error by denying Dorsey's motion to suppress because

10.

there was no illegal pretrial confrontation of D.B. and, even if there was, D.B.'s identification of Dorsey during the deposition had an origin independent of any pretrial confrontation, so its admission was harmless.

{¶ 28} Generally, "the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). However, Dorsey forfeited this error because he failed to object to D.B.'s identification of him at the trial deposition—which was the equivalent of D.B. identifying Dorsey at trial due to D.B.'s unavailability at the time of Dorsey's jury trial. Accordingly, we review the admission of D.B.'s identification testimony only for plain error. *State v. Cross*, 9th Dist. Summit No. 25487, 2011-Ohio-3250, ¶ 49 ("The law is well settled that failure to contemporaneously object [to] testimony * * * forfeits appellate review."); *see also State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 92 (defendant's objection to testimony after the close of the state's case—rather than during the witness's testimony—forfeited defendant's appellate arguments related to the testimony).

{¶ 29} Plain error is an error that affects an appellant's substantial rights. Crim.R. 52(B). An error that affects substantial rights is one that "affected the outcome of the trial." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage

11.

of justice." *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001), citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. After reviewing the record, we cannot find that the trial court committed plain error by admitting D.B.'s testimony identifying Dorsey as the shooter.

{¶ 30} When determining whether an eyewitness identification is admissible, the trial court is usually faced with a situation where "a witness has been confronted with a suspect *before trial * * *.*" (Emphasis added.) *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992), *superseded on other grounds by constitutional amendment*. In those cases, the trial court must first determine if the procedure used by the state to secure the pretrial identification was "unnecessarily suggestive." *Id.*, citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). If the court determines that the pretrial identification was, in fact, the result of an unnecessarily suggestive confrontation, it must then determine whether, under the totality of the circumstances, the identification was reliable despite the unnecessarily suggestive confrontation. *Id.* at 439, citing *Biggers* at 198.

{¶ 31} In other words, the fact that an identification is unreliable—without some predicate impermissible state action—does not automatically preclude the admission of the identification testimony at trial. *State v. Neal*, 1st Dist. Hamilton No. C-140667, 2015-Ohio-4705, ¶ 29, citing *Perry v. New Hampshire*, 565 U.S. 228, 245-246, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012); and *State v. Hogan*, 10th Dist. Franklin No. 11AP-644, 2012-Ohio-1421, ¶ 11. Instead, the unreliability of the identification testimony goes to

12.

its weight, not its admissibility, as the U.S. Supreme Court made apparent in *Perry* when it clarified that the "due process check for reliability * * * comes into play only *after* the defendant establishes improper police conduct," and the "Constitution * * * protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." (Emphasis added.) *Perry* at 237, 241.

{¶ 32} In this case, however, we are presented with a slightly different situation—an initial identification *at trial*. Neither the United States Supreme Court nor the Ohio Supreme Court has directly addressed the question of the appropriate test for the admissibility of first-time, in-court eyewitness identification. The issue is relatively rare. Before *Perry*, the few Ohio appellate courts confronted with this situation tended to find that in-court identifications were suggestive, and allowed the identifications if they complied with the reliability test in *Biggers*. *See, e.g., State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634 (10th Dist.), ¶ 58, citing *State v. Johnson*, 163 Ohio App.3d 132, 2005-Ohio-4243, 836 N.E.2d 1243 (10th Dist.) (first-time, in-court identifications are admissible if they are reliable under the totality of the circumstances).

{¶ 33} The appellate courts that have addressed the issue since *Perry* have also allowed the testimony in the absence of an unduly suggestive procedure used to procure the in-court identification, but have used two distinct rationales to support their decisions.

13.

{¶ 34} The Fifth and Eighth Districts have continued to follow the pre-*Perry* rationale that first-time, in-court identification testimony is admissible only if it meets the test for reliability first articulated in *Biggers*. *State v. Jenkins*, 8th Dist. Cuyahoga No. 105881, 2018-Ohio-2397, ¶ 37 ("Here, it is undisputed that [the witness] did not identify Jenkins as the shooter prior to trial. As a result, our analysis turns on whether [the witness's] in-court identification was reliable."); *State v. Ramirez*, 5th Dist. Richland Nos. 16CA95 and 16CA96, 2018-Ohio-595, ¶ 40. That is, these courts skip directly to the second step of the two-step analysis outlined in *Biggers*, despite a lack of unnecessarily suggestive pretrial confrontation.

{¶ 35} The First and Tenth Districts, on the other hand, have concluded that identification testimony is admissible, and, consistent with *Perry*, have held that any issues with the testimony's reliability go to its weight, not its admissibility; these courts have also held, consistent with *Perry*, that the defendant's due process rights are protected in cases of first-time, in-court identifications by normal trial procedures. *State v. Berry*, 10th Dist. Franklin No. 18AP-9, 2019-Ohio-3902, ¶ 25, quoting *United States v. Whatley*, 719 F.3d 1206, 1216 (11th Cir.2013) ("[I]n the absence of impermissibly suggestive out-of-court identification procedures, 'the requirements of due process are satisfied in the ordinary protections of trial.'"); *State v. Stidhum*, 1st Dist. Hamilton No. C-170319, 2018-Ohio-4616, ¶ 38, citing *Perry* at 238-239, 245-246 ("If there is no showing that the police employed an unduly suggestive and unnecessary procedure to obtain the identification, then the unreliability of the identification alone will not preclude

14.

its admission at trial. * * * Instead, such unreliability should be exposed through the rigors of cross-examination at trial and the protections built into the adversary system, such as the right to the effective assistance of counsel, the right to confront the witness, and the rules of evidence."). Indeed, it appears that the majority of jurisdictions throughout the country have adopted this approach to the admissibility of first-time, in-court identifications following the decision in *Perry*. *See Garner v. People*, 436 P.3d 1107, ¶ 39-61 (Col.2019) (collecting federal and state cases regarding the treatment of first-time, in-court eyewitness identification).

{¶ 36} We believe that the approach of the First and Tenth Districts is the one that is better aligned with the case law in the wake of the Supreme Court's decision in *Perry*. This is particularly true considering the *Perry* court's observation, in the context of the pretrial identification in that case involving an unnecessarily suggestive confrontation that was not orchestrated by the police, that

> [a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances * * * is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place. * * * Alerted to the prospect that identification evidence improperly obtained may be excluded, * * * police officers will "guard against unnecessarily suggestive procedures." [*Manson v. Brathwaite*, 432 U.S. 98, 112, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)]. *This deterrence rationale is inapposite in*

*cases, like Perry's, in which the police engaged in no improper conduct.*

(Emphasis added.)

*Perry* at 241-242. The *Perry* court also maintained that

the potential unreliability of a type of evidence does not alone render its

introduction at the defendant's trial fundamentally unfair. * * * The

fallibility of eyewitness evidence does not, without the taint of improper

state conduct, warrant a due process rule requiring a trial court to screen

such evidence for reliability before allowing the jury to assess its

creditworthiness.

*Id.* at 245. The court reached this conclusion "in large part" because "the jury, not the

judge, traditionally determines the reliability of evidence." *Id.* Importantly, "[j]uries are

not so susceptible that they cannot measure intelligently the weight of identification

testimony that has some questionable feature." *Brathwaite* at 116.

{¶ 37} Turning to D.B.'s first-time, in-court identification of Dorsey as the shooter

in this case, although there is some element of suggestion involved in every in-court

identification, *Perry* at 244, the question that triggers the reliability review under *Biggers*

is not whether the procedure the state used to obtain the identification involved *some*

suggestion, but whether the procedure was *unnecessarily* suggestive. *State v. White*, 6th

Dist. Lucas No. L-06-1363, 2008-Ohio-2990, ¶ 81, citing *State v. Blakely,* 6th Dist. Lucas

No. L-03-1275, 2006-Ohio-185, ¶ 17; and *State v. Harris,* 2d Dist. Montgomery No.

19796, 2004-Ohio-3570, ¶ 19 ("Where it is determined that the identification procedure

16.

was not unduly suggestive, no further consideration into reliability is required.").  Here, we do not see any unnecessarily suggestive elements that trigger a reliability review.

{¶ 38} It is undisputed that the prosecutor used Dorsey's mugshot for purposes of identification, and that she only showed D.B. one photograph when she asked him to identify the shooter.  Although using a single photograph for identification can be unnecessarily suggestive, the impact is lessened when the photograph is used to confirm the identity of a person the witness already knows.  *See, e.g., State v. Huff*, 145 Ohio App.3d 555, 564, 763 N.E.2d 695 (1st Dist.2001).  Here, D.B. testified that he knew Dorsey through Facebook, which is certainly different from knowing another person "in real life," but this goes to the weight of D.B.'s identification, not its admissibility.

{¶ 39} Additionally, as the trial court recognized, Dorsey was not confined in jail and could have attended D.B.'s deposition but, for unknown reasons, he did not.  Given that Dorsey was not present for D.B. to identify in person, the state had no option but to use what it had at its disposal—i.e., the mugshot—to allow D.B. to make his identification.  After he did so, Dorsey's and Belmon's attorneys thoroughly cross-examined him regarding the circumstances of the shooting and his ability to see the shooters, with Dorsey's counsel focusing on the elements that weakened the reliability of his identification—such as darkness, D.B.'s inability to provide a physical description of "Jeromain Dorsey," and D.B.'s acquaintance with Dorsey through Facebook, but not in person.  Based on all of this information, we cannot say that any plain error occurred.

17.

{¶ 40} In support of his assignment of error, Dorsey urges us to adopt the procedure in *State v. Dickson*, 141 A.3d 810 (Conn.2016), a Connecticut Supreme Court case in which the court adopted a judicial prescreening process for all cases in which the state anticipates that a witness will identify the defendant for the first time in court. We decline to do so.

{¶ 41} Connecticut is one of only two jurisdictions that uses a judicial prescreening process for first-time, in-court eyewitness identifications.[2] *See Garner*, 436 P.3d 1107, at ¶ 39-61. And, based on the U.S. Supreme Court's reiteration in *Perry* that "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances * * * is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place * * *" and that "[t]he Constitution * * * protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit"— combined with the *Perry* court's flat-out rejection of a judicial prescreening process for eyewitness testimony that did not involve suggestive pretrial circumstances created by law enforcement—it is unlikely that the Supreme Court would approve of a judicial prescreening process like the one used in Connecticut for first-time, in-court identifications. *Perry*, 565 U.S. at 237, 241, 245.

---

[2] The other jurisdiction currently using a judicial prescreening process is Massachusetts. *See Commonwealth v. Crayton*, 21 N.E.3d 157, 169-170 (Mass.2014).

18.

{¶ 42} Because we find that due process does not require the judicial prescreening procedure in *Dickson*, we decline to adopt such a procedure for all cases of first-time, in-court identifications. And, we are not the first court in Ohio to refuse to adopt the screening procedure in *Dickson*. *Stidhum*, 1st Dist. Hamilton No. C-170319, 2018-Ohio-4616, at ¶ 39, quoting *Perry* at 245 ("'The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness.'"); *Ramirez*, 5th Dist. Richland Nos. 16CA95 and 16CA96, 2018-Ohio-595, at ¶ 41 (rejecting, without analysis, the appellant's request to adopt the holding in *Dickson*).

{¶ 43} In sum, the trial court did not commit plain error in permitting D.B. to identify Dorsey as the shooter, and because no judicial prescreening was necessary, we find that Dorsey's first assignment of error is not well-taken.

**B. Dorsey's conviction is supported by sufficient evidence.**

{¶ 44} In his second assignment of error, Dorsey argues that his complicity to commit felonious assault conviction is not supported by sufficient evidence. He contends that D.B.'s identification of him as the shooter—which was the only evidence tying Dorsey to the crime—cannot support the conviction because D.B.'s identification was the result of an unnecessarily suggestive confrontation at the trial deposition. In response, the state argues that Dorsey's conviction is supported by sufficient evidence because

19.

D.B.'s testimony, if believed, shows that Dorsey knowingly caused or attempted to cause physical harm to D.B. by means of a deadly weapon.

{¶ 45} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, we will not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 46} Dorsey's sufficiency-of-the-evidence argument hinges on the impropriety of D.B.'s identification of him as the shooter. But we have already determined that the identification testimony was properly before the jury. Moreover, even if we had determined that D.B.'s identification was inadmissible, sufficiency looks at all of the evidence—whether properly admitted or not. *State v. Brewer*, 8th Dist. Cuyahoga No. 87701, 2007-Ohio-4291, ¶ 16, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 80; and *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). When D.B.'s identification testimony is considered with the rest of the evidence presented at trial, we cannot find that Dorsey's conviction is unsupported by the evidence.

20.

{¶ 47} Dorsey was convicted of complicity to commit felonious assault under R.C. 2903.11(A)(2) and 2923.03(A)(2), which requires the state to prove that the defendant knowingly aided or abetted another in causing physical harm to a person by means of a deadly weapon. To show that the defendant "aided or abetted another," the state must prove that the defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal," which can be inferred from the circumstances surrounding the crime. *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. "Physical harm" is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A gun is a deadly weapon. *In re Marcus T.D.*, 6th Dist. Lucas No. L-02-1376, 2004-Ohio-477, ¶ 9; R.C. 2923.11(A), (B); *see also State v. Vondenberg*, 61 Ohio St.2d 285, 289, 401 N.E.2d 437 (1980) (trier of fact can draw reasonable inferences about the deadly nature of a weapon used in the commission of a crime).

{¶ 48} The evidence presented at trial showed that D.B. was shot in the neck and paralyzed, and that Belmon and another person worked together in some capacity that ultimately resulted in D.B.'s injuries. The night of the shooting, one of the assailants—Belmon—who was "like [D.B.'s] brother" arranged a meeting with D.B., either to meet with some "females" or for a drug deal. Belmon arrived at D.B.'s address in a car driven by someone D.B. did not know, so D.B. would not get in the car. Instead, they began walking to their destination. While they were walking, the second assailant came up

behind them. Belmon had a gun, so he pretended to protect D.B., but soon turned his gun on D.B. as well. Both assailants started shooting at D.B., who ran. D.B. got caught on a fence while fleeing, and the second assailant shot him in the neck. D.B. laid wedged between the fence and the house for approximately six hours before a passerby heard him shouting for help and called 911.

{¶ 49} Woody and Walden, the officers who found D.B., each testified that D.B. identified "Raheem Dorsey" as the shooter when Woody asked him who had shot him. But after Woody was unable to find a "Raheem Dorsey" in TPD's system, D.B. clarified that it was two men: "Raheem *and* Dorsey." (Emphasis added.) Although detectives compiled a photo array from which D.B. identified Belmon, they never attempted to have D.B. identify Dorsey in a photo array.

{¶ 50} D.B. testified to the poor visibility conditions. It was approximately 3:00 a.m. in an area without streetlights, so it was very dark. The second shooter was approximately 20 feet from D.B. when he began shooting. D.B. never gave police a physical description of the second shooter, and was unable to testify to what the second shooter was wearing, what hairstyle he had, or if he had any facial hair. Regardless, D.B. knew that the second shooter was not wearing a hat or glasses, and specifically testified that he saw and remembered the second shooter's face. D.B. identified the second shooter as "Jeromain Dorsey," whom D.B. knew only from being Dorsey's Facebook friend; D.B. and Dorsey had never met in person before the shooting. D.B. identified Dorsey as the "Jeromain Dorsey" who shot him.

22.

{¶ 51} Based on this information, we find that Dorsey's complicity to commit felonious assault conviction is supported by sufficient evidence. If believed, the testimony presented at trial shows that the second shooter, who D.B. positively identified as Dorsey, worked together with Belmon to cause physical harm—i.e., a severed spinal cord and paralysis—to D.B. by shooting D.B. Accordingly, Dorsey's second assignment of error is not well-taken.

**C. Dorsey's conviction is not against the manifest weight of the evidence.**

{¶ 52} In his third assignment of error, Dorsey argues that his complicity to commit felonious assault conviction is against the manifest weight of the evidence. To support his argument, he again relies on D.B.'s identification of him as the shooter being inadmissible. The state responds that Dorsey's conviction is supported by the weight of the evidence because the jury was free to believe D.B.'s testimony, and the fact that it did so does not render the conviction invalid.

{¶ 53} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15,

23.

citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 54} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 6th Dist. Wood No. WD-07-009, 2008-Ohio-1557, ¶ 62, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 55} After reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that the evidence weighs heavily against a conviction. We cannot say that the jury lost its way or created a manifest miscarriage of justice by believing D.B.'s testimony identifying Dorsey as the shooter, despite the issues weighing against the reliability of his identification. We find, therefore, that Dorsey's conviction is not against the manifest weight of the evidence. Thus, his third assignment of error is not well-taken.

### D. Dorsey received effective assistance of counsel.

{¶ 56} In his final assignment of error, Dorsey argues that his trial counsel was ineffective because she did not call alibi witnesses, failed to object to D.B.'s identification of Dorsey at the trial deposition, and failed to have Dorsey attend the deposition. The state responds that trial counsel's decision to forgo alibi witnesses was trial strategy, counsel's failure to object to D.B.'s identification, without more, does not prove ineffective assistance, and Dorsey failed to show how counsel's performance, as it relates to securing Dorsey's appearance at the deposition, fell below an objective standard of reasonable representation.

{¶ 57} To prevail on a claim of ineffective assistance of counsel, the appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Properly licensed Ohio lawyers are presumed to be competent, *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62, and there are "countless" ways for an attorney to provide effective assistance in a case, so "'[j]udicial scrutiny of counsel's performance must be highly deferential.'" *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689.

{¶ 58} To establish ineffective assistance of counsel, the appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability

25.

that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002), quoting *Strickland* at 694.

{¶ 59} Counsel is "strongly presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985), quoting *Strickland* at 694-695. Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of ineffective assistance of counsel. *State v. Grissom*, 6th Dist. Erie No. E-08-008, 2009-Ohio-2603, ¶ 22.

{¶ 60} Dorsey first complains that trial counsel failed to call alibi witnesses at trial, despite filing a notice of alibi. Critically, there is no evidence in the record that Dorsey actually had any witnesses who could support an alibi, so his "claim rests on mere speculation and is insufficient to establish ineffective assistance." *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 202, *overruled on other grounds, State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475. Additionally, although the state did not present any witnesses or evidence that would have countered an alibi defense from Dorsey, the state called Belmon's ex-girlfriend, who testified that Belmon asked her to fabricate an alibi for him, and offered a letter that Belmon wrote to his ex-girlfriend that contained detailed instructions about the story he wanted her to tell

26.

his lawyer. The fact that the state had already introduced the idea of fabricated alibi testimony could have factored into trial counsel's decision about calling alibi witnesses, which is precisely the type of strategic decision-making that is not subject to second-guessing on appeal. *Id.* at ¶ 203. Accordingly, we find that this argument lacks merit.

{¶ 61} Dorsey next complains that his attorney was ineffective for failing to object to D.B.'s identification testimony at the deposition. Generally speaking, not objecting to testimony is a matter of trial strategy. *State v. Holmes*, 6th Dist. Lucas No. L-17-1111, 2019-Ohio-896, ¶ 95. And trial strategy cannot form the basis of an ineffective-assistance claim. *Grissom* at ¶ 22.

{¶ 62} Furthermore, "[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988). Rather, the appellant must show that (1) there was a substantial violation of defense counsel's essential duties to her client and (2) he was materially prejudiced by counsel's ineffectiveness. *State v. Shaw*, 6th Dist. Lucas No. L-15-1165, 2016-Ohio-7699, ¶ 19, citing *Holloway* at 244. This can be done by showing that a single failure to object resulted in the admission of evidence so prejudicial that it essentially defaulted the case to the state or by counsel "'so consistently fail[ing] to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.'" *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006).

{¶ 63} Here, Dorsey does not show that counsel consistently failed to object to clearly objectionable testimony. Nor do we find that counsel's failure to object to D.B.'s identification of Dorsey at the deposition essentially forfeited the case. As discussed above, D.B.'s in-court identification was not the result of an unnecessarily suggestive confrontation and was, therefore, admissible. At trial, the jury was entitled to give the identification testimony whatever weight it felt that the testimony merited after seeing D.B. testify and taking into consideration the testimony's shortcomings. Thus, counsel's failure to object to the identification testimony does not rise to the level of a substantial violation of her essential duties to Dorsey or show that he was materially prejudiced by counsel's actions, *Shaw* at ¶ 19, and is insufficient to show that trial counsel provided ineffective assistance.

{¶ 64} Finally, Dorsey argues that trial counsel was ineffective for failing to ensure that he was present at the deposition so that D.B. could identify him in person, which, he claims, would have resulted in his motion to suppress being granted and would have changed the outcome of the proceedings. Initially, we note that there is nothing in the record showing that counsel was at fault for Dorsey failing to appear at the deposition or that she failed to make efforts to have Dorsey—who was not incarcerated—attend the deposition. Indeed, Dorsey does not allege that counsel took or neglected to take any specific actions that prevented him from appearing at the deposition, such as failing to inform him of the deposition, scheduling it at a time that he was not available, or giving him the wrong location.

28.

**{¶ 65}** Regarding the motion to suppress, to prevail on a claim of ineffective assistance related to a motion to suppress, the record must support two findings: (1) a finding that the motion would have been granted and (2) a finding of prejudice to appellant's case. *See State v. Gott*, 6th Dist. Lucas No. L-14-1066, 2015-Ohio-917, ¶ 28. Dorsey mentions in passing that the results of the motion to suppress would have been different if he had been present at the deposition. We disagree. Dorsey's argument presumes that D.B. would not have identified him if he had been physically present at the deposition, but there is no support for that in the record. D.B. testified that he saw and remembered the second shooter's face and that he was familiar with Dorsey from their friendship on Facebook. This testimony does not lead to the conclusion that D.B.'s identification would have changed if Dorsey had been in the room, or that the outcome of the motion to suppress would have been different if D.B. had identified Dorsey in person instead of from a photograph.

**{¶ 66}** Because Dorsey has failed to show that his trial counsel's representation of him fell below an objective standard of reasonable representation, we find that he has failed to prove that trial counsel provided ineffective assistance of counsel. Dorsey's fourth assignment of error is not well-taken.

### III. Conclusion

**{¶ 67}** The May 15, 2019 judgment of the Lucas County Court of Common Pleas is affirmed. Dorsey is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                             _____
                                                          JUDGE

Christine E. Mayle, J.

                                                     _____

Gene A. Zmuda, P.J.                                    JUDGE
CONCUR.

                                                          _____
                                                          JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.